No. 16,113.

MARDEN ET AL. *v*. BECKWITH.
(205 P. [2d] 781)

Decided April 11, 1949.

Mr. ALDEN T. HILL, Mr. LLOYD E. WILLIAMS, Mr. RALPH H. COYTE, for plaintiffs in error.

Mr. H. W. SEAMAN, Mr. CONRAD L. BALL, for defendant in error.

*In Department.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

BECKWITH, defendant in error, filed his complaint on August 23, 1946, against plaintiffs in error, to recover two thousand dollars, balance claimed as a five per cent commission on sale of property on which defendants had a lease and option. The parties will be referred to herein as they appeared in the trial court, namely, plaintiff and defendants.

Trial was had to a jury and verdict returned in the plaintiff's favor in the sum of two thousand dollars with interest. To this judgment error is assigned in reception and rejection of evidence; uncontradicted proof of accounts stated and full payment; plaintiff's testimony, as well as that of the defendants', shows no express agreement to pay a commission, and that on the uncontradicted testimony, the issue of the existence of an express agreement to pay a commission was submitted to a jury.

The defendants operated the Ferncliff Dairy in Estes Park, Colorado, and were the owners of the major por-

tion of the equipment and the business, and operated the business in a building as lessees under a lease that was not assignable and which contained an option to buy the real property for the sum of forty thousand dollars.

Beckwith, the plaintiff, being a real-estate broker in Loveland, Colorado, took a Mr. Vessey and a Mr. Laws, who were interested in purchasing a business of some kind, to Estes Park on January 24, 1946 to show them a cottage camp, filling station and other property, but in which the prospective purchasers were not interested and while having lunch with his prospects on that day, Beckwith said he had heard that the Ferncliff Dairy was for sale and that if he could list it, he would show it to them. After lunch, he took the prospects to defendants' dairy where only Mrs. Marden, one of the defendants, was present. He inquired of her if the plant was for sale and she told him it was. When asked the price, she told him sixty-five thousand dollars.

Beckwith says that when he asked her if she would list it with him that she asked him what his commission was and he told her it was five per cent. Mrs. Marden testified that Beckwith asked her if the owner was there, and she told him that he was not there, but in Denver on that day, but that she was Mrs. Marden; and they asked if the plant was for sale and she told him that it was; and she further testified that the price was sixty-five thousand, and on being asked what that included she said, "That includes the building and real estate; the dairy business; the dairy equipment, etc. We do not own the building, but we have a lease with an option to buy, and the whole price is sixty-five thousand dollars."

Mrs. Marden took the prospective purchasers through the plant and plaintiff was told that he would have to talk the matter of sale over with Mr. Marden, the owner, and plaintiff admitted that he knew he would have to

deal with Mr. Marden, who would be in Estes Park the next day. The following day, January 24, 1946, plaintiff again took the prospective purchasers to Estes Park and after long discussion with Mr. Marden, together with a study of Marden's lease and option, the agreement to buy the property was reached. Owing to the fact that Marden was not the owner of the real property and only had an option to buy it for forty thousand dollars, two separate contracts were entered into between the Mardens and the purchasers. One contract for the sale and purchase of the creamery business and equipment for the sum of twenty-five thousand dollars, and the other, a separate contract for the sale and purchase of the real property for the sum of forty thousand dollars, and deposits were made on the deal. Later, the purchasers completed the purchase of the creamery business or plant and went into possession. The real-estate transaction was closed at a later date, and it is clearly shown by the evidence that the Mardens received nothing from the sale of the real-estate, and their option was exercised through the purchasers for the purpose of delivering ownership and possession of the creamery or plant to the purchasers.

Plaintiff, learning that the twenty-five thousand dollar contract on the creamery plant had been carried out on June 12, 1946, billed Marden for the first time and this statement appears as Exhibit 1, and is as follows:

"Michael Marden
"In Account With
Frank Beckwith Agency
Insurance Specialists
"209 Lincoln          Phone 60
"Dependability                    Service
"June 1, 1946   Commission due on sale
of Estes Park Creamery $1,250.00"

This bill was enclosed in a letter from plaintiff to Marden which is as follows:

"Mr. Michael Marden,                    "June 12, 1946
Estes Park, Colorado
"Dear Mike,

"Enclosed you will find my statement for commission due on the sale of your creamery.

"I am at loss to understand why this commission has not been paid long ago, as I understand the deal was completed several months past.

"You will note that I have charged you only the 5%, whereas the regular commission rate for sale of business property is 10%, however, if I have to wait for my commission any longer, it will be necessary to charge that rate, or at least charge interest on it.

"Thanking you for past favors, and with kindest personal regards to yourself, and Mrs. Marden, I am,

"Yours very truly,
"Frank L. Beckwith"

On receipt of the letter and statement, Marden, on June 13, 1946, mailed his check to the plaintiff in the following quoted letter:

"Mr. Frank L. Beckwith                    "June 13, 1946
409 Lincoln Avenue
Loveland, Colorado
"Dear Frank:

"I take pleasure in handing you herewith check for $1,250 as the realtor's commission in the sale of the plant here.

"Your statement just received is the first indication I have had from you as to what you thought was right in the situation. I did not like to discuss it before Don who has been present most of the times I have seen you.

"Regards,
"Sincerely yours,
* * *

"Michael Marden"
Plaintiff Beckwith never replied to this letter.

Plaintiff in his complaint, and repeatedly during the trial, stood squarely on an express agreement to pay five per cent commission on the entire purchase price. To maintain his position, he gave his own unsupported testimony that the Mardens, or at least, Mrs. Marden, had agreed to pay the five per cent commission. This was contradicted by the Mardens. The purchasers were witnesses and stated that during the first day when plaintiff was talking with Mrs. Marden, and at the time she showed them through the plant, they heard nothing said about a commission; and that at no time did plaintiff and Mrs. Marden talk in their absence.

By instruction No. 2, this issue was submitted to the jury in the following words:

## "Instruction No. 2

"You are instructed that under the pleadings in this case, the sole and only issue to be determined by the jury is whether or not the defendant Ruby T. Marden expressly, or in so many words, orally agreed on January 24, 1946, to pay plaintiff Beckwith a commission of 5% on the aggregate sales price of both the Ferncliff Dairy business and the building of $65,000.00."

Considering the points specified as error, our attention is directed first to point No. 11, "The verdict was not supported by the evidence." The following testimony of the plaintiff attracts our attention:

"Q. At the time she listed it, did she list the whole property? A. She represented herself and her husband as owning the whole property, and she listed it at $65,000.00. Q. And you say you told her your commission would be five percent? A. Yes, sir, she asked the first thing what my commission would be, and I told her it would be five per cent. Q. And did she agree to that? A. Yes, sir."

\* \* \*

On Cross Examination.

"Q. Isn't it a fact, Mr. Beckwith, that you never at any time said anything to Mr. or Mrs. Marden about any commission? A. Well, I presumed after Mrs. Marden had talked with me and I told her what the commission was, that he— Q. No, just answer the question Yes or No. Isn't it a fact that you never talked with Mr. and Mrs. Marden about any commission? A. That's right."

We are at a loss to understand from this testimony the basis for plaintiff's claim of an agreed commission. This testimony, coupled with the exhibits hereinbefore quoted, lowers plaintiff's asserted claim to an irreducible minimum.

In addition to this apparent weakened state of plaintiff's case, is added the fact that it is not disputed that anything was ever said to Mr. Marden, the owner, about a commission; and the defendants contend that, as shown by the exhibits hereinbefore set out, an account stated was proven. We believe defendants' contention on this point was meritorious and sustained by the proof.

On cross-examination of plaintiff the following occurred: "Q. Now lets suppose Mr. Beckwith that the Mardens had merely assigned over their option to buy the building from Guy Albright to your purchasers instead of making a separate contract from Mardens to your purchasers for the building, and a separate contract for the sale of the business, would you then believe and insist that you were entitled to a commission on both deals? Mr. Ball: If the Court please, we object to that as wholly incompetent, irrelevant and immaterial; that is not an expert witness to testify to those facts and this is purely a suit on a definite contract. The Court: The objection is sustained."

We believe this was proper examination and it was searching in its nature as to whether plaintiff was actually relying on an express contract, and if not, it

certainly was material as to his right to recover on any other theory. This was proper cross-examination and the court erred in sustaining the objection.

The defendants called Mr. Raney, a real-estate broker—not involved in the suit—as a witness and offered to prove by him that Mr. Marden had listed the Ferncliff Dairy with him for sale at twenty-five thousand dollars and that in addition, he had explained to the witness that he had an option on the building for forty thousand dollars which he would transfer to the purchaser without additional charge or compensation; also offered to prove by Raney and Mrs. Claire Noyes, another realtor, of Estes Park, that it is not the custom and practice of realtors in Estes Park and vicinity to charge commission on an option transferred without additional consideration at the time of the purported sale, but to charge one commission on the business. This offer of proof was rejected by the court and defendants contend that they were thereby denied the right to introduce evidence of circumstances that would show that the making of an express oral agreement by the Mardens to pay a five per cent commission to plaintiff on the sale of property they did not own and upon which they only had an option, was of such an unreasonable nature that intelligent people would not enter into such a contract. This position is well supported by the decision of this court in the case of *Dexter v. Collins,* 21 Colo. 455, 42 Pac. 664, where the rule on this question is set out in paragraph 1 of the syllabus as follows: "Where the testimony of the parties to an action upon an alleged contract of employment [to sell real estate] is directly contradictory, evidence of circumstances existing at the time the contract is alleged to have been made which tend to show that the making of the agreement would have been unreasonable on part of defendant may be given in corroboration of his statement." This rule was approved and adopted in *Brown*

*v. Tourtelotte,* 24 Colo. 204, 50 Pac. 195, and *Kilpatrick v. Inman,* 46 Colo. 514, 105 Pac. 1080.

■ Where, as in the instant case, there is conflict of testimony on a material point, any fact tending to show the probability or improbability thereof should be admitted. Judicial discretion in receiving or rejecting such evidence, or the restriction of cross-examination should be exercised so as to not deprive the cross-examiner of the right to test the credibility and the veracity of witnesses.

■ An additional reason for reversal of the judgment herein was the court's refusal of defendants' request for an instructed verdict, because plaintiff's letter of June 12, 1946 to the defendant, and plaintiff's testimony that he knew he would have to make the deal with Marden and that there is no testimony to the effect that Mr. Marden ever agreed to pay a commission, fully refutes plaintiff's claim that there was an express oral agreement. This left no issue to go to the jury after Beckwith's positive election to stand on the express oral agreement.

For the reasons herein set out, the judgment should be, and is, reversed.

MR. CHIEF JUSTICE HILLIARD and MR. JUSTICE HAYS concur.